Minute Order Form (06/97)

# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | John W. Darrah | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 99 C 6514 | **DATE** | 11/9/2000 |
| **CASE TITLE** | SHARON D. BOYD vs. VILLAGE OF CAROL STREAM | | |

**MOTION:** [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

Memorandum

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]
(2) ☐ Brief in support of motion due _____.
(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.
(4) ☐ Ruling/Hearing on _____ set for _____ at _____.
(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.
(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.
(7) ☐ Trial[set for/re-set for] on _____ at _____.
(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.
(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
    ☐ FRCP4(m)  ☐ General Rule 21  ☐ FRCP41(a)(1)  ☐ FRCP41(a)(2).
(10) ■ [Other docket entry] Enter memorandum opinion and order. For the reasons stated herein, Defendants' motion for summary judgment is denied.

(11) ☒ [For further detail see order (on reverse side of/attached to) the original minute order.]

| | No notices required, advised in open court. | | | |
|---|---|---|---|---|
| | No notices required. *Memo given in Court* | | number of notices | **Document Number** |
| | Notices mailed by judge's staff. | | NOV 13 2000 | |
| | Notified counsel by telephone. | | date docketed | |
| ✓ | Docketing to mail notices. | | | 36 |
| | Mail AO 450 form. | | docketing deputy initials | |
| | Copy to judge/magistrate judge. | | | |
| LG | courtroom deputy's initials | Date/time received in central Clerk's Office  00 NOV 12 PM 5: 24 | mailing deputy initials | |

# UNITED STATES DISTRICT COURT,
# NORTHERN DISTRICT OF ILLINOIS,
# EASTERN DIVISION.

| | |
|---|---|
| SHARON D. BOYD, ) | |
| ) | |
| Plaintiff, ) | Case No. 99 C 6514 |
| ) | |
| v. ) | Judge John W. Darrah |
| ) | |
| VILLAGE OF CAROL STREAM, ) | |
| a Municipal Corporation, et al., ) | **DOCKETED** |
| ) | NOV 1 3 2000 |
| Defendants. ) | |
| ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiff Sharon D. Boyd ("Boyd") has filed suit against Defendants, Thomas McPike ("McPike"), John Kauffman ("Kaufmann"), John Chaplin ("Chaplin"), and the Village of Carol Stream ("Village") for race discrimination under Title VII of the Civil Rights Act of 1964 ("Title VII"), as amended 42 U.S.C. § 2000(e) et seq., and 42 U.S.C. § 1981. (Compl. 3,4). Boyd alleges that Defendants did not hire her for a position in the Carol Stream Police Department because of her race (African-American) as part of a continuing pattern and practice of discriminating against applicants on the basis of race. Defendants Chaplin, Kauffman, and McPike move for summary judgment pursuant to Fed.R.Civ.P. 56, claiming both absolute and qualified immunity for their acts. For the reasons that follow, the Court denies their motion for summary judgment.

## LEGAL STANDARDS

Summary judgment is appropriate when there remains no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c); *Cincinnati Ins. Co.*



*v. Flanders Elec. Motor Serv., Inc.*, 40 F.3d 146, 150 (7th Cir. 1994). "One of the principal purposes of the summary judgment rule is to isolate and dispose of factually unsupported claims or defenses..." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Thus, although the moving party on a motion for summary judgment is responsible for demonstrating to the court why there is no genuine issue of material fact, the non-moving party must go beyond the face of the pleadings, affidavits, depositions, answers to interrogatories, and admissions on file to demonstrate through specific evidence that there remains a genuine issue of material fact and show that a rational jury could not return a verdict in the non-moving party's favor. *Celotex*, 477 U.S. at 322-27; *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 254-56 (1986); *Matsushita Elec. Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986); *Waldridge v. American Hoechst Corp.*, 24 F.3d 918, 923 (7th Cir. 1994).

Disputed facts are material when they might affect the outcome of the suit. *First Ind. Bank v. Baker*, 957 F.2d 506, 507-08 (7th Cir. 1992). When reviewing a motion for summary judgment, a court must view all inferences to be drawn from the facts in the light most favorable to the opposing party. *Anderson*, 477 U.S. at 247-48; *Popovits v. Circuit City Stores, Inc.*, 185 F.3d 726, 731 (7th Cir. 1999). However, a metaphysical doubt will not suffice. *Matsushita*, 475 U.S. at 586. If the evidence is merely colorable or is not significantly probative or is no more than a scintilla, summary judgment may be granted. *Anderson*, 477 U.S. at 249-250.

## BACKGROUND

The undisputed facts taken from the parties' Local Rule 56.1(a) & (b) statements of material facts (referred to herein as "Pl.'s 56.1(a)" and "Defs.' 56.1(b)") and exhibits are as follows.

Plaintiff Sharon Boyd applied for a position with the Village of Carol Stream Police

Department on November 11, 1997, after reading a newspaper advertisement. (Pl.'s 56.1(a) ¶ 1). The Village prints at the bottom of its newspaper ads "that minorities and females are especially encouraged to apply." (Pl. Ex. I 22). Boyd is an African-American female.

Carol Stream's estimated population for the year 2000 is 39,100. (Pl. Ex. A ¶ 15). Defendants Chaplin, Kaufmann, and McPike served as members of the Village's Board of Fire & Police Commissioners at the time Plaintiff's application for employment was considered. (Def's 56.1(a) ¶ 2). Chaplin, Kaufmann, and McPike are all white males. (Pl. Ex. A ¶ 9, 10, 11). Chaplin finished his three-year term on the Board in 2000 and decided not to continue on the Board. (Def. Ex. C 9). McPike has served on the Board since 1989 and, at the time of his deposition, had been the Chairman for four years. (Def. Ex. A 6, 35). Kaufmann has served on the Board since 1979. (Def. Ex. B 10).

The application process for employment as an officer with the Carol Stream Police Department begins with submission of an application and completion of a written test. (Defs' 56.1(a) ¶ 28). After candidates take the written test, their names are added to an eligibility list, with their position on the list being determined by their score on the written test. (Pl.'s 56.1(a) ¶ 15). After this list is made, applicants may request that points be added to their score for having served in the military, having a college degree, or having previously served on a municipal police department. (Pl.'s 56.1(a) ¶ 16). After these additions are made, a "primary eligibility list" is assembled. (Def.'s 56.1(a) ¶ 29). The top scorers from the eligibility list are asked to submit to a polygraph test, a psychological test, and a background check. (Def.'s 56.1(a) ¶ 29). Candidates are then invited to interview with the Commissioners.

Prior to conducting the oral interview, the Commissioners review each applicant's written

application, the polygraph results, background investigation, and psychological/personality assessment. (Pl.'s 56.1(a) ¶ 28).

The Chairman (McPike) is in charge of running the oral interview. (Def. Ex. A 33). During the interview, the applicant appears before the Board, is instructed to take a seat, and then asked a series of questions. (Pl.'s 56.1(a) ¶ 24). Each Commissioner asks the same questions during each interview. (Def. Ex. A 35). Each of the Commissioners assigns the applicant a score of 1 to 5 points in 20 different categories, for a maximum total of 100 points. (Pl. Ex. S). The Commissioners' 3 overall scores are averaged, and if the average is over 70, the applicant passes the oral interview. (Pl. Ex. K 47). Candidates who pass the oral interview are then offered a position with the police department, subject to completion of a medical evaluation. (Def. 56.1 ¶ 29).

Plaintiff Boyd took the written examination and scored an 85. (Pl.'s 56.1(a) ¶ 161). Plaintiff then completed a psychological/personality evaluation, polygraph test, and background investigation. (Pl. Ex. E, F, G). When interviewed in conjunction with the background investigation, Plaintiff's former supervisor (a Sergeant in the Chicago Sheriff's Department) recommended that Plaintiff be hired for the position. (Pl. Ex. E 3). Plaintiff's psychological valuation was conducted by Stephen A. Lasar Associates ("Lasar"). (Def. Ex. A 30). After assessing Boyd's personality, Lasar recommended that Plaintiff be hired as a police officer. (Pl. Ex. F 7). The Village no longer uses Stephen A. Laser Associates to do their psychological valuations. (Def. Ex. A 30).

Plaintiff was then invited to interview with the Commission. Applicants who had not scored as high as Plaintiff on the written test were not invited to interview. Before conducting Plaintiff's oral exam, Commissioners Chaplin, Kaufmann, and McPike reviewed the Plaintiff's psychological evaluation, polygraph results, and the results of her background investigation. (Pl.'s 56.1(a) ¶ 34).

The Commissioners first learned that Plaintiff was African-American at the time of her interview. (Def.'s 56.1(a) ¶ 44).

The Plaintiff's interview lasted approximately 23 minutes. (Pl. 56.1 Resp. ¶ 45). Each of the Commissioners gave the Plaintiff a failing score on her oral exam. (Pl.'s 56.1(a) ¶ 35). McPike gave Plaintiff a score of 54 out of a possible 100 on her oral exam. (Pl.'s 56.1(a) ¶ 49). Chaplin gave Plaintiff a score of 45 on her oral exam. (Pl.'s 56.1(a) ¶ 50). Kaufman gave Plaintiff a score of 42 on her oral exam. (Pl.'s 56.1(a) ¶ 51). Plaintiff was denied a position with the Carol Stream Police Department on June 8, 1998. (Def.'s 56.1(a) ¶ 2).

Approximately 12 African-Americans applied for the position of police officer in Carol Stream before the Plaintiff. (Def. Ex. A 42). At the time of Plaintiff's interview, the Village had never employed an African-American police officer. (Pl.'s 56.1(a) ¶ 11). At the time this lawsuit was filed, the Village had never employed an African American police officer. (Pl. Ex. A 1). This year, Carol Stream hired its first African-American police officer. (Pl. Ex. K 44).

Since October 1999, Plaintiff has been employed by the Chicago Police Department as a probation officer. (Pl.'s 56.1(a) ¶ 175, Pl.'s Ex. H 29).

## ANALYSIS

Plaintiff Boyd has filed suit against Defendants Chaplin, McPike, Kaufmann, and the Village for race discrimination under Title VII.[1] Defendants Chaplin, McPike, and Kauffman move for

---

[1] 42 § 2000e-2. (a) of Title VII provides in relevant part:
It shall be unlawful employment practice for an employer for an employer–
(1) to fail or refuse to hire or to discharge any individual, or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin.

-5-

summary judgment pursuant to Fed.R.Civ.P. 56, claiming both absolute and qualified immunity for their acts.

## Immunity Claims

Immunity is an "entitlement not to stand trial or face the other burdens of litigation." *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985). Because the "entitlement is an immunity from suit rather than a mere defense to liability, ... it is effectively lost if a case is erroneously permitted to go to trial." Id.

## Absolute Immunity

Defendants assert they are entitled to absolute immunity in their motion for summary judgment because their acts were legislative in nature ("At its core, the legislative function involves determining, formulating, and making policy. In the instant case, the function at issue includes the very decision about which the plaintiff now complains.")(Def. Mot. 5).

According public officials absolute immunity for their acts is disfavored. The Supreme Court has noted the presumption "that qualified rather than absolute immunity is sufficient to protect government officials in the exercise of their duties." *Burns v. Reed*, 500 U.S. 478, 487 (1991). Indeed, the Court has stated that it is "quite sparing in [its] recognition of absolute immunity, and [has] refused to extend it any further than its justification would warrant." Id. "The government official seeking immunity, therefore, has the burden of showing that an exemption from personal liability is justified 'by overriding considerations of public policy...'" *Rateree v. Rockett*, 852 F.2d 946 (7th Cir. 1988)(citations omitted).

State legislators are accorded absolute immunity when they act "in a field where legislators traditionally have power to act." *Tenney v. Brandhove*, 341 U.S. 367, 379 (1951). State officials

outside the legislative branch are entitled to legislative immunity when they perform legislative functions. *Supreme Court of Virginia v. Consumer Union of United States, Inc.*, 446 U.S. 719, 731-734 (1980). This protection extends to local officials for acts taken "in the sphere of legitimate legislative activity." *Bogan v. Scott-Harris*, 523 U.S. 44, 118 S.Ct. 966, 967 (1998) (Citing *Tenney*, 341 U.S. at 376). At issue then is whether Defendants' decision not to hire Plaintiff for a position in the Carol Stream Police Department falls within the sphere of "legitimate legislative activity."

"Whether an act is legislative turns on the nature of the act, rather than on the motive or intent of the official performing it." *Bogan*, 118 S.Ct. at 972. In *Bogan*, a director of a city's social services department sued for discrimination after her position was eliminated from the budget. (Id. 966). The Court found that elimination of a position from the city's budget was legislative in nature since it reflected "a discretionary, policymaking decision implicating the budget priorities of the city." (Id. 973). The Court differentiated the decision from "the hiring or firing of a particular employee" since the elimination of a position in a budget "may have prospective implications that reach well beyond the particular occupant of the office." (Id.).

"[E]mployment decisions generally are administrative" except when they are "accomplished through traditional legislative functions" such as policymaking and budget restructuring, that "strike at the heart of the legislative process." *Rateree v. Rockett*, 852 F.2d 946, 950 (7th Cir. 1988). Indeed, since the *Brogan* decision, other federal appellate courts have found individual employment decisions to be administrative rather than legislative in nature. See *Canary v. Osborn*, 211 F.3d 324, 329 (6th Cir. 2000)(differentiated "personalized assessments of individual employees" from "an impersonal budgetary analysis" in finding that School Board's employment decision was administrative); *In re Montgomery County*, 215 F.3d 367, 373 (3rd Cir. 2000)("Firing a particular

employee is a personnel decision that does not involve general policy making."); *Acevedo-Garcia v. Vera-Monroig*, 204 F.3d 1, 8 (1st Cir. 2000) (acts which targeted specific individuals rather than positions were administrative rather than legislative).

Defendants seek to differentiate these cases by arguing that they concern "employment decisions made by legislative bodies"[2] (Def. Rep. 3) but fail to explain why absolute legislative immunity should shield these same employment decisions when they are made by "non-legislative" officials. The defendants cite *Mylett v. Mullican*, 992 F.2d 1347 (5th Cir. 1993) and *Healy v. Town of Pembroke Park*, 831 F.2d 989 (11th Cir. 1987) for the proposition that public officials should be afforded absolute immunity for their employment decisions. (Def. Mot. 4, 5). In addition to being decided in other circuits <u>before</u> *Brogan*, these cases are readily differentiable from the present one. In *Mylett*, the Fifth Circuit afforded absolute <u>judicial</u> immunity to the decision of a commission affirming an earlier decision to fire an employee; here, the Defendants argue they are entitled to absolute <u>legislative</u> immunity. In *Healy*, the "firing" found to merit absolute immunity was not a decision based on the merits of the police officers; rather, it was made as part of a decision to contract out the community's police services. *Healy*, 831 F.2d, at 993.

It is clear from the record that Defendants' decision not to hire Plaintiff was administrative rather than legislative. Their decision was based on Plaintiff's alleged merits as a candidate. They explained their decision by noting her poor responses to their questions during the interview. (Def. Mot. 8). At no time in the decision-making process, did they consider larger policy concerns like

---

[2] Of course, this is not strictly true. *Acevdeo-Garcia* concerned an action brought against a Mayor and a human resources director; *Canary* concerned an action brought against School Board members; *Montgomery County* concerned an action brought against county commissioners.

personnel or budgetary needs. Moreover, Defendants' admission in their reply brief that they "do not at any time exercise any legislative function on behalf of the Village of Carol Stream" further weakens their claim to absolute legislative immunity. (Def. Rep. 2-3) Although Defendants argue that they are entitled to "absolute legislative immunity" for actions taken within the course and scope of their discretionary powers as officials of the Village (Def. Rep. 3), this is not the law.

After reviewing the facts in this case, the court finds that Defendants' decision not to hire Plaintiff was not legislative and, therefore, denies Defendants' claim to absolute legislative immunity.

*Qualified Immunity*

Defendants next assert that their decision not to hire Plaintiff is entitled to qualified immunity if "their perceptions of the [P]laintiff's performance during her oral interview ... and their refusal to hire the [P]laintiff as a police officer because of those perceptions ... were 'reasonable.'" (Def. Mot. 6).

The Supreme Court explained the nature of qualified immunity in *Harlow v. Fitzgerald*, 457 U.S. 800, 817 (1982). It noted, "[g]overnment officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." (Id. 817). To evaluate a claim of qualified immunity, courts engage in a two-step analysis. *Jacobs v. City of Chicago*, 215 F.3d 758, 766 (7th Cir. 2000). First, courts determine whether the plaintiff's claim states a violation of their statutory or constitutional rights. (Id.). Second, courts determine whether those rights were "clearly established at the time the violation occurred." (Id.). On summary judgment, a court may "determine, not only the currently applicable law but whether that

law was clearly established at the time an action occurred." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). "If the law was clearly established, the immunity defense ordinarily should fail since a reasonably competent public official should know the law governing his conduct." (Id.).

Plaintiff's claim meets the first step of the two-part test for qualified immunity; she has alleged a violation of her statutory rights under Title VII of the Civil Rights Act of 1964, as amended 42 U.S.C. § 2000(e) et seq., and 42 U.S.C. § 1981. (A.Compl. 3,4). Plaintiff's claim under Title VII would also constitute a violation of her constitutional rights under the Equal Protection Clause since the meaning of the Equal Protection Clause and the Civil Rights Act of 1964 do not differ in regards to cases of alleged racial discrimination. *League of United Latin American Citizens v. The City of Santa Ana*, 40 F.Supp. 873 (C.D. Cal. 1976).

However, Plaintiff's claim does not meet the second step of the two-part test for qualified immunity in that she has alleged a violation of "clearly-established law." She claims that Defendants made their decision not to hire her based on her race rather than her qualifications. (A. Compl. ¶ 13). "Generally, the relevant issue of law is whether the right the defendant is <u>alleged to have violated</u> was 'clearly established' at the time the defendant acted or failed to act." *Behrens v. Pelletier*, 516 U.S. 299, 313, 116 S.Ct. 834 (1996). The inquiry as to whether a law is "clearly established" focuses on whether "a reasonable person would have been on notice that her actions violated clearly established law." *Erwin v. Daley*, 92 F.3d 521 (7th Cir. 1996). Defendants themselves admit that "the rights to be free from racially discriminatory hiring practices is clearly established," providing the court authority for this proposition (citing *Payne v. Abbott Laboratories*, 999 F.Supp. 1145 (N.D. Ill. 1998)). (Def. Mot. 8). See also *Auriemma v. Rice*, 910 F.2d 1449, 1457 (7th Cir. 1990)("Any police chief who thought he could demote and promote only along allegedly clear racial lines could

not be a reasonable police chief."); *Mohr v. Chicago School Reform Board of Trustees*, 99 F.Supp.2d. 934, 939 (N.D.Ill. 2000)(Bucklo, J.) ("any reasonable administrator would know that intentional racial discrimination was illegal"). In short, Defendants do not dispute that the relevant law prohibiting racial discrimination in employment decisions is clearly established.

What Defendants do argue is that there is no "clearly established law" prohibiting potential employers from making employment decisions based on the assessment of candidates in personal interviews. (Def. Mot. 8). Strictly speaking, the Defendants are correct that employers may consider employees' responses to questions in interviews when making employment decisions. However, the actual basis of Defendants' employment decision is what is at issue in this case.[3] Furthermore, Defendants assert that *Rakovich v. Wade*, 850 F.2d 1180, 1210 (7th Cir. 1987) stands for the proposition that "when the qualified immunity question is posed in terms of generalities, the defendant would never be entitled thereto." Actually, that case states that when considering whether the alleged conduct set out a constitutional violation, "plaintiffs' supported allegations are assumed true, including intent." *Rakovich*, 850 F.2d at 1210.

Defendants contend that questions relating to their credibility are "simply not an appropriate consideration by this court with respect to the question of qualified immunity." (Def. Rep. 4). However, their claim to qualified immunity is dependent on their ability to prove their hiring

---

[3] The Defendants cite *Erwin v. Daley*, 92 F.3d 521, 525 (7th Cir. 1996) for the proposition that courts must focus on the "objective legal reasonableness of the action, and not the state of mind or good faith of the officer in question." (Def. Mot. 7). The factual background of *Erwin* is not analogous to the present case. In *Erwin*, the court considered a situation in which the basis for employment decisions was clear. The *Erwin* court considered "whether it was clearly established in 1990 that, in the light of a prior judicial finding of discrimination, the use of numerical promotional goals for the promotion of minority police officers and the use of racially standardized test results violated the Equal Protection Clause of the 14th Amendment." Id. at 526. In the present case, the basis of Defendants' employment decision is in dispute.

decision was based solely on merit. Defendants admit that "if the plaintiff is able to persuade a trier of fact that she is in fact correct in her version of events, she may well be entitled to recover for the actions taken by employment decision makers of the Village." (Def. Rep. 4).

Essentially, the Defendants have veiled an argument regarding the merits of Plaintiff's claim in the guise of a motion for summary judgement based on absolute and qualified immunity.[4] This decision appears particularly costly for Defendants because they devote the majority of their argument to discussion of absolute and qualified immunity but spend little effort arguing why the record presents no factual dispute as to the <u>basis</u> of the employment decision.

*Disputed Issues of Material Fact*

Motions for summary judgment in employment discrimination cases must be approached "with added rigor" because credibility and intent are often central issues. *Adreani v. First Colonial Bankshares Corp.*, 154 F.3d 389, 393 (7th Cir. 1998). "[A]ffidavits and depositions must be carefully scrutinized for circumstantial proof which, if believed, would show discrimination." *Collier v. Budd Co*, 66 F.3d 886, 891 (7th Cir. 1995).

Defendants Chaplin, Kaufmann, and McPike have cited Plaintiff's performance during the interview (i.e. her "hesitance, lack of decisiveness or self-assurance in responding to the various

---

[4] Judge Easterbrook considered a similar argument in *Elliot v. Thomas*, 937 F.2d 338, 340 (7th Cir. 1991). He observed:
> Qualified immunity, we know from Mitchell, establishes a right not to be tried. When rules of law clearly establish public officials' duty, the immunity defense is unavailable. So, too, the interlocutory appeal to vindicate the right not to be tried is unavailable when there is no legal uncertainty; there is no separate "right not to be tried" on the question whether the defendants did the deeds alleged; that is precisely the question for trial.
>
> \* \* \*
>
> By slight of hand you can turn any defense on the merits into a defense of qualified immunity.

questions") as the basis of their decision not to hire her. (Def. Mot. 8). Plaintiff Boyd has met her burden of proving the existence of a disputed issue of material fact as to whether this explanation is credible or merely a pretext for racial discrimination.

First, Plaintiff has denied Defendants' account of the interview. Defendants have claimed that Plaintiff failed to give prompt answers to questions during the interview, noting that on one occasion there was a one-minute-forty-six-second pause before the Plaintiff answered. (Pl. Ex. K 55.). Defendants have further claimed that for other questions, Plaintiff had to be prompted to give answers. Plaintiff has denied the truth of these statements, noting that at no time did the Defendants have to wait for more than 2 seconds for an answer to their questions. (Pl.'s Ex. H 83). Plaintiff contends that she gave her responses in a confident, assertive manner. (Id.). "A party's own deposition can constitute affirmative evidence to defeat a summary judgment motion." *Collier v. Budd Co.*, 66 F.3d 886, 891 (7th 1995). Furthermore, this rationale for giving the Plaintiff poor scores conflicts with Defendant McPike's testimony that candidates' scores were not decreased based upon the amount of time it takes to answer. McPike noted that scores "were not increased or decreased because we were basically looking for the content of the answer given by the candidate." (Pl. Ex. K 56).

A review of Plaintiff's background investigation and psychological profile reveals conflicting assessments of Plaintiff's assertiveness and the extent to which it would impact her ability to perform the duties of a police officer. Sgt. Fisher's (Plaintiff's former supervisor) assessment of Plaintiff's assertiveness consisted of the following (Pl. Ex. E 3):

> At first, Sgt. Fisher said that he did not know if she would be able to handle the job of police officer, or if she would be able to handle herself in a physical situation. Sgt. Fisher said that Ms. Boyd appears to be very shy and unassuming. She does not

-13-

come across as a a very assertive person. This could cause problems in arrest situations and other volatile situations.

\* \* \*

At the end of the conversation, Sgt. Fisher said that Mrs. Boyd is a good worker and she should be given the chance to prove she could do the job. He related with experience, Mrs. Boyd would become more assertive. Sgt. Fisher said that he believes that she could perform the day-to-day job of patrol officer, if she realized that she had to stay pro-active to succeed.

The investigator's (Det. Ed Sailer) own assessment of Plaintiff consisted of the following (Id. 5):

During the interview, Ms. Boyd came across as being shy and sometimes timid. She was pleasant to talk to, but appeared to lack some self-confidence.

In contrast, the psychological assessment completed by Stephen A. Laser Associates concluded that Plaintiff's alleged shyness would not impact her ability to perform the duties of a police officer. (Pl. Ex. F 5-7). The Lasar report reads in relevant part:

Although this applicant strikes us as having been quite shy at one time, her test results indicate that she is now more sociable and outgoing. Thus, she should integrate fairly well among her peers and the public.

\* \* \*

Earlier, we alluded to some slight reservations about Mrs. Boyd's shyness, but we expect her to be assertive enough to enforce the law and effect forceful arrests when necessary. We administered an enforcement role-play to the applicant and were satisfied with her assertive and diplomatic response.

\* \* \*

In this role-play, the applicant demonstrated assertiveness, diplomacy, and good judgment.

\* \* \*

We really have no major concerns about this applicant ... [t]herefore, we recommend this applicant for the police officer position.

Like her former supervisor, the Lasar report concludes that Plaintiff should be hired as a police officer. (Id.).

A disputed issue of material fact exists as to whether Defendants may have reviewed the psychological assessment and background check and seized on Plaintiff's alleged lack of

-14-

assertiveness as a pretext for denying her employment.

First, there is disagreement amongst the three Commissioners as to whether the results of the background check and psychological screening are used to evaluate the candidate. Kaufmann said he reviews the psychological screening to evaluate the candidate. (Pl. Ex. I 57). Chaplin also said he reviewed the candidate's background investigation and psychological screening before the interview. (Pl. Ex. J 22). Chaplin admitted that "to an extent" the evaluation of the interview was also based on information learned in the background investigation. (Pl. Ex. J 46). But when McPike, who chairs the Commission, was asked whether the Commissioners use applicant's written application, polygraph report, and psychological screening report to score the oral interview, he responded that the applicant is always scored on the oral interview only. (Pl. Ex. K 41).[5] But later, McPike admitted that some applicants are questioned about their background investigations. (Pl. Ex. K 94).

The Commissioners' varying accounts and descriptions of the interview fairly draws into question the credibility of their assessment of Plaintiff.

Although the Commissioners score applicants in 20 categories, Chaplin says all he could remember about Plaintiff's answers was her "reluctance to answer or her lack of an immediate response." (Pl. Ex. J 27). He didn't recall anything else about her answers to his or the other Commissioners' questions. Id.

Defendant Kaufmann, when deposed, attempted to explain his scoring of the interview by noting that Plaintiff was "very timid" but also says, a few moments later, that she was "a little

---

[5] Although McPike does admit that he reviewed Boyd's application, psychological evaluation, and background investigation prior to the oral exam. (Pl. Ex. K 51).

-15-

overbearing." (Pl. Ex. I 43). When asked directly whether Plaintiff was overbearing, Kaufmann responded, "She seemed to be – No. I cannot recall. Scratch it." (Id. 44). Conversely, McPike stated in his deposition, "I don't recall any period during the oral interview where she was overbearing." (Def. Ex. A 75). However, Kaufmann did remember that Plaintiff "was among the poorest of the candidates I've seen in 20 years." (Pl. Ex. I 54).

Defendants' decision to hire Michael Brodnan and other white males also creates doubt as to the basis of the Commission's decision not to hire Sharon Boyd. The Plaintiff scored higher on the written exam (85) than Michael Brodnan (84), Kelly Lally (84), Lloyd Elliot (81), Tom Zimmerman (80), and Steve Pettorelli (79), all of whom were ultimately hired by the Village police department. (Pl. Ex. A 4, Pl. Ex. C 3). These five are all white males. (Pl. Ex. C 3).

The Plaintiff argues specifically that she was more qualified than Michael Brodnan. (Pl. Resp. 14). She argues that her psychological assessment was far stronger than that of Brodnan. (Id.) Although the court does not necessarily agree that his psychological assessment was "far stronger" than that of Boyd (they both were recommended to be hired), the court does find that the weaknesses discussed in his psychological assessment draws the Board's decision-making process into question. For instance, the psychological assessment notes that Brodnan's work habits may prove to be a "supervisory frustration." (Pl. Ex. L 7). It also noted that "this applicant has been job-hopping since high school." (Pl. Ex. L 6). Although Brodnan had been "job-hopping since high school" and didn't have any prior law enforcement experience, Kaufmann gave him four's in the categories of "Interest in police work" and "Motivation to become a police officer." (Pl. Ex. O). Although Plaintiff was the daughter of a Chicago Police Officer and had been a deputy sheriff for three years, Kaufmann gave her "two's" in these same categories. (Pl. Ex. R). Conversely, Lasar Associates had noted in

its psychological assessment that "this applicant is attracted to police work because of a strong and sincere desire to be of service to the public." (Pl. Ex. F 4).

Furthermore, while Plaintiff's supervisor (a sergeant in the Sheriff's department) recommended that she be hired, one of Brodnan's former supervisors actually said that Brodnan had been on the verge of being fired for poor attendance before he quit a prior job. (Pl. Ex. M 2).

Also of interest is the relative scoring of Plaintiff and Brodnan in the "Financial situation/goals" category. Although Brodnan had admitted in his background check that his sizeable credit card debt was the result of his "going wild" with the credit card, both Commissioners Kaufmann and McPike, gave him "four's" in the "Financial situation/goals" category. When asked whether Brodnan had a lot of debt for a police officer candidate, McPike answered, "It appears so." (Pl. Ex. K 117). Conversely, Plaintiff was given a "two" by Kaufmann, a "zero" by Chaplin, and a "two" by McPike in the same category after she admitted to a prior bankruptcy filing. (Pl. Ex. K, 94, R , S , T).

A review of the Commissioners' scoring of Brodnan relative to that of Plaintiff further supports Plaintiff's argument that the stated reasons for denying her employment constituted a pretext for racial discrimination.

Defendants' discussion of the record is limited. They repeat the alleged reason for their decision not to hire Boyd: Plaintiff's supposed "hesitance, lack of decisiveness or self-assurance in responding to the various questions." (Def. Mot. 8). Defendants move on to note the altruistic nature of the positions they occupy ("These three individuals, who serve out of a desire to serve the public"). (Def. Mot. 9). However, Defendants' alleged altruism will not shield them from liability if a finder of fact concludes they discriminated against Plaintiff. Defendants conclude their analysis

-17-

of the record by pointing out the absence of evidence of racist comments in the record. (Def. Mot. 9.) Defendants present no authority that evidence of racial slurs or racist comments are necessary to make out a prima facie case of racial discrimination.

The Defendants do not attempt to respond to questions of fact raised by the Plaintiff in their response (Pl. Resp. 10-15), and it is not proper for this court to make Defendants' arguments for them. "[J]ust as a district court is not required to scour the record looking for a factual dispute, it is not required to scour the party's various submissions to piece together appropriate arguments. A court need not make the lawyer's case." *Little v. Cox's Supermarkets*, 71 F.3d 637, 641 (7th Cir. 1995).

Sharon Boyd has provided evidence from which a finder of fact could reasonably infer that Defendants' proffered reasons are a pretext for discrimination. "If the employee offers specific evidence from which the finder of fact may reasonably infer that the proffered reasons do not represent the truth, the case then turns on the credibility of the witnesses." *Collier v. Budd Company*, 66 F.3d 886, 893 (7th 1995). When the resolution of a plaintiff's claim depends on the credibility of witnesses' testimony, "this credibility judgment is best left to the finder of fact." Id. "Where the evidence viewed in the light most favorable to [the plaintiff] ... raises a question of fact as to the believability [of the proffered reasons] ... [t]he 'ultimate question of discrimination' ... is best resolved by the trier of fact, whose function it is to choose among competing inferences and make credibility determinations." Id. (citing *Courtney v. Biosound*, 42 F.3d 414, 418 (7th Cir. 1994)).

After reviewing the litigants' arguments and the record in this case, the court finds that disputed issues of material fact exist as to the actual basis of Defendants' decision not to hire Plaintiff. These disputed issues of material fact require this court to deny Defendants' Motion for Summary Judgment.

## CONCLUSION

For the reasons stated herein, Defendants' Motion for Summary Judgment is denied.

**IT IS SO ORDERED.**

John W. Darrah, Judge

United States District Court

Date: November 9, 2000